UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GRACE YOUNG,                                                    ECF CASE

                Plaintiff,

  -against-                                                    <u>COMPLAINT</u>

LASSO MARKETING INC. and IQVIA, INC.,

                Defendants.                    PLAINTIFF DEMANDS A
                                         <u>TRIAL BY JURY</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Grace Young ("Plaintiff" or "Young"), by and through her attorneys, Vladeck, Raskin & Clark, P.C., complains of Lasso Marketing Inc. ("Lasso") and IQVIA, Inc. ("IQVIA") (collectively, the "Company" or "Defendants"), as follows:

<u>NATURE OF ACTION</u>

1.      Young, an Asian-American woman, is a highly successful young professional. She has helped increase the value of multiple technology startups, leading to their acquisitions. It was no different when Young joined Lasso in 2021. She made numerous invaluable contributions to the Company, which led to its acquisition by IQVIA.

2.      Despite Young's contributions, the Company never publicly recognized her for them. Indeed, men at the Company would often take credit for her and other women's work. Young asked repeatedly for a raise, promotion, and additional equity grants, but the Company either delayed granting her requests and gave her pretextual reasons for why it could not do so. The Company also underpaid Young and other women significantly. The disparity in Young's compensation became even more clear when IQVIA acquired Lasso and Young saw the salaries and total packages received by the exclusively male and almost exclusively white executives. They received many times what Young did from the acquisition, despite contributing the same or less

to the Company than she did. Young made protected complaints about the disparate treatment of women throughout her employment.

3.      Young has been diagnosed with various mental health conditions. During her employment with the Company, she attempted suicide. After she was medically cleared to return to work, the Company placed her on an administrative leave.

4.      The Company asserted that administrative leave was justified because of communications she had with Lasso Chief Executive Officer Greg Field ("Field"). The same standards, however, were not applied to Field. Field frequently made romantic and sexual overtures towards Young and spoke with her about personal matters. The Company was undoubtedly aware of Field's harassing conduct, and many employees made comments about it.

5.      Following her administrative leave that extended for many weeks, the Company effectively demoted Young. It assigned her no work and ostracized her from her former Lasso colleagues. It then dismissed her, despite her significant contributions to the Company.

6.      The Company's actions were motivated by Young's gender, race, disability, and protected activities. Young brings this action to remedy Defendants' discriminatory and retaliatory treatment. Specifically, Young brings this action to remedy violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "NYSHRL"); and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL")

<u>JURISDICTION & VENUE</u>

7.      This Court has jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. § 1331 and 42 U.S.C. §2000e-5(f)(3).

8.     Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims because these claims closely relate to the Title VII claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants regularly do business in New York, New York and many of the acts of discrimination and retaliation occurred within the Southern District of New York.

10.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, Plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

11.     The administrative exhaustion prerequisites have been satisfied, including that Plaintiff filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against Defendant and that the EEOC issued Plaintiff a notice of right to sue.

<u>PARTIES</u>

12.     Young, an Asian-American woman, is a professional specializing in computer science. She worked for Lasso and, following its acquisition, IQVIA, from March 2021 until her unlawful dismissal in December 2022. She is a resident of New York.

13.     Lasso was a start-up company headquartered in Texas. Lasso has an office in New York City, where it employed Young.

14.     IQVIA acquired Lasso in or around July 2022. IQVIA is headquartered in North Carolina. IQVIA continues to operate Lasso, including its New York City office where it employed Young.

FACTUAL ALLEGATIONS

Plaintiff's Background

15.     Young is an Asian-American woman. She has been diagnosed with multiple serious mental health conditions.

16.     Young received a Bachelor of Arts degree in Mathematics and a Master of Science degree in Applied Mathematics, both from Harvard University, in 2019.

17.     Young also took courses in Mathematics, Computer Science, and Philosophy at the Massachusetts Institute of Technology.

18.     Before joining Lasso, Young worked for multiple technology companies. Young has helped multiple start-up companies increase their value, which has led to their acquisitions by larger companies.

19.     For example, in or around 2015, Young joined Tribe Dynamics, which was a start-up company. Young was one of the first employees at Tribe Dynamics. At Tribe Dynamics, Young was responsible for data analytics, data science, data operations, product development, and business operations. Young helped to solve the Company's data quality problems and served as the missing piece connecting its technical and non-technical teams. The Company still uses some of the products Young developed. After Young left, Tribe Dynamics was acquired by another company, CreatorIQ.

20.     Also, in 2019, Young was hired as a Product Management Supervisor at Crossix Analytics, a healthcare analytics company. In November 2019, Veeva Systems, Inc. ("Veeva"), a cloud-based software company, acquired Crossix Analytics.

21.     During Young's employment with Veeva, she initially worked on internal data tools, process improvement, and automation on the tagging team. Later, Young focused on the

Company's external client-facing software platform, DIFA, and oversaw the DIFA Partner Program through which the Company established relationships with publishing platforms. Young built and maintained relationships with over two dozen publishing platforms, customized solutions to integrate partner data into DIFA, and rebuilt the interface allowing ad agency clients to upload media plans into the software platform.

<u>Lasso and IQVIA Background</u>

22.     Young joined Lasso as a Senior Product Manager, based in New York City, in March 2021. Much of the conduct described below took place in New York City.

23.     Lasso is a healthcare marketing and analytics company, which was founded as a start-up in 2019, and is headquartered in Austin, Texas but has offices in other locations. Most of its employees worked in New York City.

24.     Chief Executive Officer Greg Field ("Field"); Chief Revenue Officer Mike DiNorscio ("DiNorscio"); and the Chief Technology Officer, all white men, founded Lasso in 2019.

25.     Field lives in Austin, Texas, but often comes to New York City for work.

26.     On or about July 25, 2022, IQVIA acquired Lasso. Young became an IQVIA employee in or around September 2022.

27.     IQVIA is a health information technology company providing advanced analytics, technology solutions, and clinical research services to the life sciences industry.

28.     IQVIA is headquartered in Durham, North Carolina and has over 340 employees based in New York City

<u>Young's Successful Career at Lasso</u>

29.     Field personally recruited Young to join the Company. He wanted to build a product that would directly compete with Crossix/Veeva, and Young's experience at Crossix/Veeva was directly relevant to the work she would do for the Company.

30.     During Young's employment at Lasso, she made numerous critical contributions to the Company. She received two promotions and consistently received praise from senior management and her peers and external clients, partners, and vendors. In addition, the industry recognized the work that she did even though Lasso did not give her public credit for it.

31.     Due to Young's efforts, the value of Lasso, a start-up company, increased significantly and, as set forth herein, led to IQVIA purchasing Lasso. Both Lasso's CEO Field and Frank Lin ("Lin"), Vice President and General Manager of Digital Media at IQVIA, confirmed that Young's work led to IQVIA purchasing Lasso. On information and belief, Lin was IQVIA's primary decisionmaker in moving ahead to acquire Lasso.

<u>Young Built the Key Lasso Modules</u>

32.     Lasso's platform was comprised of four modules: Audience, Activation, Measurement, and Publisher. This Court has recognized that the Audience, Activation, and Measurement modules form the "principal stages" of healthcare programmatic advertising platforms. <u>FTC v. IQVIA Holdings, Inc.</u>, 710 F. Supp. 3d 329, 343-44 (S.D.N.Y. 2024).

33.     During Young's employment, she built and ultimately oversaw two of these "principal" platforms, Audience and Measurement, and played a key role in selling and growing the Publisher module. Young was the go-to person both internally and externally for any questions about Audience and Measurement modules, data, and several other areas.

34.     Field told Young that he was hiring her to build Lasso's Measurement platform, which he described as the most important part of Lasso. Lasso's Measurement platform offering was designed to measure the return on investment of advertising for Lasso clients. These kinds of measurements are difficult to produce in media, particularly in healthcare.

35.     CEO Field told Young that the Measurement module was the only proprietary part of Lasso's platform and the only part of the business that had intellectual property value.

36.     Young's work was innovative. The Measurement tool she created made Lasso the first platform to provide over-the-counter ("OTC") Sales Lift Analysis in its measurement suite, connecting healthcare professionals, affiliates, patients, and purchasing behavior. Young developed and built Lasso's gross metrics product, known externally as Lasso Vision. This was the fastest measurement solution in the industry, providing weekly insights to advertisers. Young also designed and built a way to measure non-digital advertising campaigns via doctors' offices and pharmacies. Young's ideas and her work frequently solved client and industry challenges that had been considered virtually, if not completely, unsolvable.

37.     The Company's announcement of the Measurement tool, created by Young, even impressed Lasso's competition. Internal messages and chats from Lasso competitor DeepIntent, which are public due to the Federal Trade Commission's lawsuit against IQVIA, show the significance of Young's accomplishments. For example, DeepIntent employees, including its Chief Executive Officer, made comments such as: "The recent Lasso measurement announcement is a good reminder that the competitio[n] is relentlessly pursuing DeepIntent. To stay ahead of the competition, Engineering and Product needs to move faster, with more shared urgency and agility to keep our competitive distance from Lasso and PulsePoint."; "competition is catching up . . . need to accelerate the innovation"; and that the Measurement tool announcement "reinforces the

driving need to successfully launch Patient Planner, our latest product innovation, to the marketplace. . . . We need to continue the focus on making our current product suite superior to the competition while accelerating product innovation to maintain our competitive advantage" Id. at 384.

<u>Other Examples of Young's Success at the Company</u>

38.    Some additional examples of Young's accomplishments included:

•    Within her first six months at Lasso, Young led a team of engineers and designers to build from the ground up multiple distinct measurement solutions, including. but not limited to, pharmaceutical campaigns targeting Healthcare Professionals ("HCP"); pharmaceutical campaigns targeting Direct-to-Consumer ("DTC"); sales analysis for consumer-packaged goods ("CPG") and OTC products; and HCP and DTC audience quality for publishers. Each of these products involved their own unique data sources, methodology, UI, and sales process. The sales analysis and audience quality products were in pilot phase (just one client) when Young was there, but since she was dismissed, each one has led to a significant revenue stream that keeps growing. Competitors took over a decade to build just a few of these products. Young did it all in a few months.

•    Young also completely redid the originally barebones user interface and turned Lasso's Measurement platform into the modem, sleek, and user-friendly interface that clients gave great feedback about and that Lasso continues to use today.

•    Young's role quickly expanded to include data partnerships, including but not limited to RWE, clinical, healthcare, claims, CPG, and identity data. Young took over managing the existing partnership that Lasso had with PurpleLab, and through her efforts sourcing, vetting, negotiating, and managing, she added a couple dozen extra data partnerships that each provided

unique value to Lasso's products and clients. These partners consistently expressed how much they enjoyed working with Young and were impressed by her.

• Young also led sales and client delivery for Audience and Measurement, building multi-million-dollar client relationships. Those clients repeatedly praised Young's work and insisted on working with her.

<u>Young's Promotions and Additional Responsibilities</u>

39.     In or around December 2021, in recognition of her strong performance, Lasso promoted Young to Head of Data Products and Partnerships (although she did not receive a raise). At the time, Young was the first Lasso employee who was given a "Head" title in recognition of the expansive scope of her work beyond products, including sales and operations.

40.     Lasso promoted Young a second time from Senior Product Manager to Director. At the time the Company hired her, the possible levels for Lasso employees, from most senior to junior, included C-level, Vice President, Director, Senior-level employee, and employee. Later, the Company added other levels, including Senior Vice President and Senior Director.

41.     In addition, Lasso gave Young positions of increasing responsibility. For example, beginning within a few months of joining Lasso, Young served as the general manager for the non-Activation modules of Lasso's platform (Audience and Measurement) and led Lasso's data partnerships, including, but not limited to, real world evidence ("RWE"), clinical, healthcare, claims, CPG, and identity data.

42.     Field recruited Young for a senior position working with him closely. While Young worked for Lasso, Field did not have a Chief of Staff. Two Lasso employees had previously applied for this role and been rejected. In November 2021, Field suggested to Young that she become his Chief of Staff. The responsibilities of this position were unclear to Young, but it would have

involved working much more closely with Field. Young had never expressed any serious interest in being Field's Chief of Staff before he suggested it, but he told Vice President McLean Shaw ("Shaw"): "Grace wants to be my Chief of Staff, she just doesn't know it." He then told Young that she was the only person he would ever consider to be his Chief of Staff. Young never formally assumed the Chief of Staff role.

<u>Work Young Did Beyond the Scope of Her Job</u>

43.     During her employment with Lasso, Young frequently took on significant responsibilities that fell outside of her job description, including, but not limited to, documentation, team education, sales, operation, recruiting, hiring, and compliance. For example, Young developed Lunch and Learn curriculum series for ongoing team education; created shared calendars for conference rooms; created the sales "playbook," which included a step-by-step guide from initial contact to post-sales; devised interview process decks and educated teams on how to hire effectively; and ensured the Company stayed compliant with government and industry regulations. On information and belief, the Company continues to use some of the materials she prepared. Shaw frequently praised Young's successes and efforts in these areas, many of which were his responsibilities and not hers.

44.     Although not considered a member of the Sales team and never given a commission bonus incentive, Young was consistently recognized by Field, DiNorscio, and other members of the sales team as being an effective seller in sourcing deals, giving client demos/presentations, addressing client questions, following up, and devising innovative solutions to address problems, leading to many millions of dollars in deals.

45.     Young sourced client leads and deals that had nothing to do with her product areas, gave demonstrations, negotiated and finalized deals, and served as a main point of contact for

clients. Several clients increased their spending with Lasso based on their satisfaction with Young's work. In fact, some clients threatened to end their contracts with Lasso after Young's dismissal, stating that the main reason they worked with Lasso was because of Young.

46.     Despite not being formally named his Chief of Staff, Young performed a number of duties specifically for Field, including going on "listening tours," running "Ask Greg [Field] Anything" sessions, and managing difficult interpersonal situations for him involving employees, including outside Young's team. Young effectively acted as a conduit for the rest of the company to speak with and ask questions of Field. Through these interactions, Young helped Field improve his image at the Company.

<u>Praise for Young's Work and External Recognition</u>

47.     Field and other colleagues repeatedly complimented Young's work. By way of example only, some of the praise Young received is set forth below.

•       On multiple occasions prior to Young's promotion to the Director level, Field commented to Young that she was performing work beyond that of a Director-level employee.

•       A few months after Young joined Lasso, Field described Young as the "#1 person at the company."

•       After Young's promotion, in or around December 2021, Field told her that he thought her career was "going to be a rocket ship."

•       On another occasion, Field described Young as "Lasso's rock star" and expressed to her that she should be praised more for her contributions to the Company.

•       Shaw consistently credited Young with building "the best and most robust data partnership program in the business."

•       A Lasso Product Manager described Young as "a powerhouse" and "integral to Lasso's growth."

•       An account manager with whom Young worked at Lasso described her as the "go-to" at the Company for "all things data and partnerships" and said that she was "a cultural leader" in the organization.

•       Following Young's promotion to Head of Data Products and Partnerships, she received over a dozen messages via Slack from fellow colleagues praising her work, reiterating how well deserved the promotion was and how critical to the company and the broader team her work and knowledge was.

•       Several Lasso applicants and employees told Young that they had wanted to join the Company to work with her.

•       Young sourced more applicants who were successfully placed into roles at Lasso than any other employee at the Company. These recruits assumed roles in various areas, including Product, Marketing, Design, and Client Services.

•       Several Lasso clients and data partners told Young and others that they thought highly of her and that she was the reason they worked with Lasso. Clients praised Young given her experience working in the industry as she was able to speak specifically about Lasso's competitive edge, including why Lasso was more effective than others in the industry. One client stated, in sum and substance, "I am sure that Lasso is very happy they hired you."

•       After the Company dismissed Young, Field gave her a stellar job reference to a potential employer.

48.     In large part due to Young's efforts, Lasso received external recognition. In 2022, Digiday, an online trade magazine for online media, named Lasso's Measurement platform the

Best Marketing Analytics Platform. This was the product that Young built and developed. Lasso did not publicly credit Young for her development of the platform.

Systematic Race and Gender Discrimination at the Company and Young's Protected Complaints

49.    During Young's employment, the Company engaged in widespread discriminatory practices against female and non-white employees at Lasso, including Young. She repeatedly protested the biased conduct.

50.    The Company's executive leadership team was made up almost entirely of white men.

51.    The Company's race and gender discrimination infected all aspects of employment. In contrast to white male employees, the Company consistently underpaid women and employees of color; subjected them to higher standards for purposes of evaluating their performances; and imposed more stringent requirements when making hiring and promotion decisions.

52.    For example, during her first year at Lasso, Young repeatedly advocated for a promotion given her stellar and critical work for the Company. Field rejected Young's promotion because the Company supposedly did not promote employees until they had completed one year of work. The Company, however, applied a different policy and practice to white male employees. During Young's initial interviews with the Company, she was told that she would be the first Product team hire and the leader of the Product team. That role went to Shaw, and the Company put Young below him. Then, within three months of joining Lasso, the Company promoted Shaw from Director to Vice President.

53.    Also, during the hiring process for an open position on Young's team, a Black woman candidate was given a much more difficult interview than a white male candidate. Young expressed concerns to her team that they had conducted the interview in a biased manner.

54.    Also, in or around October 2021, Field hired a white man onto the Product team at the Director level (the "Product Director"), without requiring him to go through the formal interview process. Young had not yet been promoted to Director, and she had been asking for a promotion to the Director level.

55.    It was clear that Young performed Director-level work. Field told Young that she was "next in line" behind Shaw in the chain of command on the Product team, despite hiring the Product Director to a Director position.

56.    Moreover, several employees complained to Young that the Product Director, on multiple occasions, exhibited behavior that was contrary to Lasso's Code of Conduct and that he was underperforming. Several female employees complained that he did not treat women with respect. Young brought these concerns to Field and Shaw, but they ignored her concerns.

57.    Also, during Young's tenure, the Company placed a male employee of color on a performance improvement plan for supposed performance problems within a month of joining Lasso. In contrast, the Company treated white employees with similar performance issues more leniently.

58.    During Young's tenure, the Company created new corporate titles to accommodate white men. For example, the Company hired a white man at the newly created level of Senior Director (the "Senior Director"). Also, in 2022, the Company hired two white men at the Senior Vice President level (the "Senior VPs"), creating a new job level to accommodate them. Multiple employees, including Young, told Field that they did not think those Senior VPs were qualified or a good fit for the team. Field dismissed Young's concerns. The Company fired both Senior VPs for underperformance within less than a year of their hiring.

59.     White men at Lasso frequently took credit for work that women had done. For example, the Senior Director, repeatedly put his name on work that female employees had completed.

60.     Also, Field promoted a white man as Head of Solutions Engineering (the "HSE") even though Young was already performing most, if not all, of the duties of that position. Young told Field and Shaw that she did not think that the HSE was qualified for the job, that she thought it was discriminatory that the HSE was getting a job title for work she was doing, and that no one on her team had been consulted about the decision. Rather than addressing the serious concerns Young had raised, Shaw accused her of campaigning against the HSE's advancement.

61.     Several women employees also experienced and complained about sexual harassment at Lasso. Lasso's Vice President of Operations, Aisha Keller ("Keller"), was aware of the pervasive sexual harassment. After multiple Lasso employees reported sexual harassment that occurred at a Company holiday party, Keller held a company-wide "Code of Conduct review." Keller told Young that she did not think the reported harassment justified individual disciplinary action or warnings.

62.     Young repeatedly complained to Field and Shaw about discriminatory treatment of women and employees of color at Lasso, including biased treatment she experienced. Young was especially vocal about her concerns in early 2022 before her suicide attempt. Young raised concerns about the application of different standards that senior management applied to women and employees of color in making hiring, promotion, and pay decisions. Young repeatedly told Field and Shaw there were gender and race discrimination problems at the Company, but they dismissed her.

63.    For example, before Young's suicide attempt in April 2022, she complained to Field and Shaw about discrimination against her. Specifically, Young complained that she was doing Shaw's job, including leading the team, yet the Company was paying Shaw more and had given him a more senior title than her. Young also complained that Shaw was getting better treatment than her because he is a white man.

64.    To Young's knowledge, the Company took no steps to address the problems she raised.

<u>Young's Disability</u>

65.    Young suffers from multiple health conditions.

66.    Young's medical conditions can affect her in numerous ways, including, but not limited to, causing significant and unpredictable shifts in her mood, such as manic and depressive episodes that may last for days or weeks and affect her energy levels, sleep, memory, attention, and concentration. These symptoms can make it difficult to perform daily tasks, including work and self-care tasks, and to maintain personal relationships. Severe episodes may require Young to take time off from work or to be hospitalized. For the most part, until Young's suicide attempt in April 2022, her medical conditions did not affect her day-to-day work.

67.    Young received treatment for her mental health conditions, including, among other treatment, attending weekly therapy sessions, attending Eye Movement Desensitization and Reprocessing therapy, and seeing a psychiatrist on a regular basis for medication management.

68.    Several of Young's colleagues and members of senior management, including CEO Field and Vice President of Product Shaw, were aware that she suffered from these conditions.

<u>Young's Medical Leave</u>

69.     On April 21, 2022, Young attempted suicide at her home in New York. Suicide attempts are prevalent among individuals who suffer from mental health conditions similar to Young's.

70.     Young contacted several of her colleagues at Lasso and they encouraged her to go to the emergency room. When Young refused, one of her colleagues reached out directly to Young's then-fiancé for assistance. Young's then-fiancé took her to the hospital.

71.     After Young was stabilized in the emergency room, she was admitted to inpatient psychiatric care. While Young was there, she contacted Shaw to let him know she would not be coming into work that day.

72.     As a result of her mental health conditions, Young required a medical leave of absence to recover from her suicide attempt. Young was in contact with the Company about taking medical leave as a reasonable accommodation. The Company approved her leave.

73.     During her medical leave, Young was frequently in contact with Field and other Lasso employees. Field, Shaw, and others came to visit Young in the hospital several times. Young also spoke to some of her colleagues by phone.

74.     Young was discharged from the hospital on Friday, April 29, 2022, and her attending inpatient physician provided her with paperwork stating that she was medically cleared to return to work on Monday, May 2, 2022.

75.     When Young spoke to Field about her returning to the office, he suggested that she take additional time off before returning to work. Young agreed.

76.     On or about May 3, 2022, Young received an email from Keller stating that the Company was "committed to [her] returning to [her] role in its full capacity," but that she should

refrain from engaging with Lasso colleagues about matters that were "not specifically of a personal nature."

Lasso Discriminates and Retaliates Against Young

77.    Even though Young was ready to return to work and had medical clearance to resume her job, the Company repeatedly thwarted her from doing so. The Company refused to reinstate her based on her gender (including the hostile work environment described below) and race; protected gender and race discrimination complaints; false assumptions about her health conditions; and as punishment for her seeking and taking a reasonable accommodation.

78.    Between May and early June 2022, Young spoke with Field, Keller, and Shaw on a weekly basis about her plans to return to work.

79.    When Young asked for a specific return-to-work date, Field and Keller made excuses, such as Field planning a trip to Europe and research that Keller cited purportedly stating that an employee should not return to work on a Monday.

80.    On June 13, 2022, Young met with Keller via video call. During this call, Keller said that Young had behaved unprofessionally by sharing details of her relationship and mental health issues with Lasso colleagues, including outside of work. Keller also criticized Young for reaching out to her colleagues when she attempted suicide. Keller told Young that she could not communicate with her colleagues about these issues moving forward.

81.    Young sent a text message to Field, who had not been on the video call, and expressed her disappointment and frustration with the way Lasso was treating her.

82.    Field responded that he needed to speak with Keller and would call Young the following day.

83.    Young did not receive any further communication from Lasso until June 29, 2022.

84.    On June 29, 2022, Keller stated to Young in an email that Lasso believed her communications with Company leadership had violated the Lasso Code of Conduct, and that as a result she would be on administrative leave until further notice. This was the first time that Lasso had notified Young that she was being placed on administrative leave instead of medical leave.

85.    Other Lasso employees who did not have disabilities and who did not engage in protected activities regularly discussed personal relationships and issues both during and outside of work. Indeed, following her discharge from the hospital, when Young had asked Field whether he was upset about the disruption her mental health episode may have caused the team, Field told Young that the kind of relationships and communications she had with Lasso colleagues "[came] with the territory of the culture" at Lasso and that he was glad the company was able to be a support system to her.

86.    Upon information and belief, the Company did not discipline other Lasso employees for personal communications with coworkers or advise them that such communications violated Company policy. In fact, as set forth below, CEO Field frequently spoke to Young about personal matters. To Young's knowledge, the Company did not punish Field, a white man, for doing so.

87.    Several of Young's Lasso colleagues, including the colleagues she told about her relationship and suicide attempt, contacted Keller to state that they did not believe Young's communications with them had been unprofessional or inappropriate, especially because the communications occurred outside of work.

88.    On information and belief, the Company punished Young because of her race, gender (including the hostile work environment described below), her health conditions, her seeking and taking an approved medical leave, and her protected discrimination complaints.

<u>Discriminatory Compensation</u>

89.    As set forth above, Young made significant contributions to Lasso that substantially increased its value and set the stage for IQVIA to purchase the start-up company. Moreover, as set forth above, senior management, including CEO Field and Young's peers, repeatedly praised her work, including describing her as the "most important person at the company" (other than Field) and "Lasso's rock star."

90.    Yet, throughout Young's employment, the Company compensated her less than similarly situated male and mostly white employees.

91.    While Young was aware that several male employees making similar contributions were paid more than she was during her employment at Lasso, she only learned the full extent of the Company's discriminatory pay practices in connection with IQVIA's acquisition of Lasso in July 2022.

92.    On or about July 21, 2022, Keller asked Young to join a call with her and Field later that day.

93.    During this July 2022 call, Keller and Field informed Young that IQVIA had acquired Lasso and thanked Young for her contributions to the Company.

94.    Field and Keller did not discuss Young's leave and return to work during that call.

95.    Lasso and IQVIA finalized the sale on or about July 25, 2022.

96.    Around this time, IQVIA hosted a meeting at its offices welcoming the Lasso employees. To Young's knowledge, the Company invited all Lasso employees to attend the meeting except her. The Company also hosted a celebratory party to commemorate the sale. It did not invite Young to that party.

97.    As part of the sale, Young received a table that identified the highest compensated employees at Lasso in connection with the transaction. All of the executives were men and were white (except for one non-white male employee who was paid less than most of the white male executives).

98.    The table revealed that the Company paid male and mostly white employees significantly more than Young in connection with the deal between Lasso and IQVIA.

99.    As part of the Lasso and IQVIA deal, Young's total package was to include a base amount and a retention bonus that would vest in three years from the transaction. Young did not receive the retention bonus because the Company dismissed her, as described below.

100.    Lasso paid male and mostly white executives more than Young even though in many instances she had similar—if not better—qualifications, industry experience, tenure at the Company, and/or success during her tenure.

101.    For example, the Company awarded Lasso's Chief Growth Officer (the "CGO"), who is an Asian-American male, a total package, including a retention bonus that would vest in three years, that was worth over three and a half times as much as Young's total package. The CGO joined Lasso almost a year after Young did in January 2022. He made minimal contributions to Lasso during his half year tenure before the sale to IQVIA.

102.    Also, Vice President Shaw, a white man, received a total package, including a retention bonus that would vest in three years, worth more than four and a half times as much as Young's total package. Shaw had joined Lasso just a few weeks before Young had. Shaw's promotion to Vice President made little sense. Young made comparable, if not more important, contributions to Lasso pre-transaction with IQVIA, and often performed work that the Company had assigned to Shaw, including successfully recruiting and leading the effort to hire new

employees to join her team. Other employees frequently commented that Young was more valuable to Lasso than Shaw was and considered her to be a more effective leader and contributor than he was. Young also had as much, if not more, industry experience than Shaw. Shaw came to the Company from a design agency. Young came to the Company from Crossix/Veena, which performs work directly related to the work the Company does.

103.    The Company awarded other white men, including the Vice President of Engineering (the "VPE"), a total package, including a retention bonus that would vest in three years, that was valued at twice Young's total package, and Vice President of Client Services (the "VPCS") a total package, including a retention bonus that would vest in three years, of more than five times Young's total package. Although they worked at Lasso longer than Young did, their longer tenures did not warrant paying them multiple times what Young was eligible to receive. Young made more significant contributions to the Company during her shorter tenure.

104.    Indeed, their work was less valuable than Young's. For example, Young developed multiple products that significantly increased the value of Lasso and likely played a big role in IQVIA's decision to buy Lasso. Significantly, Field told Young that the Measurement product she created was the most valuable part of Lasso's platform and the only part with any value as intellectual property. Outside industry executives—including the CEO of another company in the same industry; multiple industry investors; and Lasso partners, clients, and vendors—confirmed this assessment.

105.    On information and belief, neither the VPE, Shaw, nor the VPCS who received greater compensation from the sale than Young did, had advanced degrees or degrees in STEM. While the CGO has a master's degree, on information and belief, his degree is in the music business. In contrast, Young has two degrees in mathematics from Harvard University, including

a Master of Science in Applied Mathematics. Young's focus was Computer Science, which was directly tied to her work at the Company. When hiring Young, Field specifically told her that her educational background was a factor in his decision to hire her.

106.    Young's work also directly generated revenue for Lasso, while the work of other highly compensated male employees, including Shaw, did not.

107.    Later, after receiving other offers of employment, Young also discovered that her compensation at the Company was significantly under market.

Young's Protected Complaint About Disability Discrimination and Her Medical Leave

108.    On or about July 28, 2022, Young met with Field in a park. During that discussion, Field apologized to her. He admitted that Young had not done anything wrong at any point, including in her communications with him, that justified the Company not reinstating her.

109.    During the conversation on or about July 28, 2022, Field also told Young that he wanted her to return to work. He told Young she could return to work at Lasso whenever she was ready. Field also said to her that she would be placed in a role similar to the one she held before her leave, but that she would be responsible for fewer low-level tasks. He said that Young would report to him or potentially his supervisor at IQVIA, Lin.

110.    During this same discussion, Field expressed that he thought Young's leave and return to work had been handled unfairly by the Company and that he understood if she was uncomfortable having Keller involved in her return to work. He suggested that Young file a formal complaint against the Company. Field specifically asked Young to direct the complaint against Keller even though, on information and belief, he had been responsible for making the decisions about Young's job, including giving Keller the directives for her actions and communications.

111.    On or about August 3, 2022, Young received a letter from IQVIA about working for the Company. The letter stated that her new job title would be Product & Strategy Director and that she would continue to report to the same supervisor she had at Lasso, which was either Field or Shaw.

112.    On or about August 8, 2022, Young emailed Keller, Shaw, and Field and stated that she was ready to return to work.

113.    In response, Field wrote that the Company would be in touch within a few days.

114.    IQVIA Director of Human Resources Mari McCabe ("McCabe") contacted Young on or about August 9, 2022. McCabe informed Young that she would be overseeing Young's return to work.

115.    At that time, Young made a formal complaint to McCabe about unlawful discrimination. Young specifically complained that the Company had failed to handle her medical leave and return to work properly. Young raised concerns that the Company had placed her on administrative leave and refused to reinstate her in violation of the anti-discrimination laws.

116.    McCabe told Young that IQVIA would investigate her complaint. However, the Company never informed her about the findings of the investigation.

<u>The Company Further Discriminates and Retaliates Against Young</u>

117.    Following Young's protected complaint, the Company subjected her to additional discrimination and retaliation.

118.    First, for several weeks after Young's August 8, 2022 renewed request to return to work, the Company continued to refuse to reinstate her. McCabe and Senior Vice President of Technology Matthew Raggard ("Raggard") told Young that the delay was due to having to create an IQVIA email address for her. It is not credible that a tech company would need multiple weeks

to create an email address. It was not until August 22, 2022 that McCabe informed Young that she would be permitted to return to work.

119.    Second, the Company moved Young to a new position that isolated her from her Lasso colleagues.

120.    As set forth above, Field told Young that she would be reinstated to her previous job and IQVIA's August 3, 2022 letter stated that her job title would be Product & Strategy Director. Also, Field told Young that she would report to either him or Lin and the August 3, 2023 letter indicated that Young would report to Field or Shaw. After Young complained, however, everything changed.

121.    On August 22, 2022, McCabe stated that the Company would be placing Young in a new role at IQVIA.

122.    Young returned to work in her new role at IQVIA on September 26, 2022.

123.    In Young's new role, she did not rejoin her former Lasso team.

124.    Also, Young's supervisor in her new role was Raggard, not Field or Shaw. Young asked McCabe if she would still report to Field in this role. In response, McCabe told Young that she was now on the same level as Field because Field was now her "peer." This turned out not to be true.

125.    Also, the Company cut Young off from communicating with her Lasso colleagues. For example, in or around September 2022, Young sent a Slack message to DiNorscio, Lasso's Chief Revenue Officer, to ask how much revenue the Lasso Measurement product she had built from the ground up had generated. DiNorscio did not respond to Young. Moreover, Human Resources later reprimanded Young for contacting him.

126.    The Company further punished Young. On or about September 26, 2022, Raggard told Young that she would be removed from the Lasso Slack and e-mail system and not given documentation and other resources she needed to perform her job.

127.    No one else from Young's team at Lasso was moved out of Lasso at that time.

128.    In or around September 2022, Raggard told Young not to contact Lasso employees.

129.    Field also instructed Lasso employees not to contact Young. He told them via email that if Young contacted them through work channels, they should report it to McCabe and not respond to Young's message aside from congratulating her on her new role.

130.    Young was also excluded from official Company-sponsored social events with her former colleagues at Lasso and IQVIA.

131.    In addition, even though Young's job was supposed to be a promotion, it was not.

132.    In Young's new role, the Company assigned her virtually no substantive work. Between September and December 2022, the Company did not assign Young a single task or project aside from basic onboarding. Also, Young no longer had any direct reports. Shaw, by contrast, manages a large group of people. Raggard acknowledged Young's underutilization. He told Young that she was better suited for a C-Suite role than the one she was assigned.

133.    The Company told Young that her role would be focused on integrating Lasso into IQVIA, but the Company prevented her from doing the job. There was no way for Young to help integrate Lasso into IQVIA after the Company cut her off from Lasso, including communicating with Lasso employees and access to Lasso's systems. Young also learned that between September and November 2022, other Lasso employees were holding meetings about the integration and she was not included in any such meetings.

134.    Young expressed concerns to Raggard and McCabe that she could not do her job integrating Lasso into IQVIA without communicating with Lasso employees and accessing its systems. They dismissed or ignored her concerns.

135.    The mistreatment described above was based on Young's protected discrimination complaint in August 2022. The Company also targeted her because of her gender (including the hostile work environment described below). To the extent that the Company sought to distance Young from Field due to their personal relationship, which is described in detail below, the Company only punished Young and not him.

<u>The Company Subjects Young to Gender Based Harassment</u>

136.    Soon after Young's hire, CEO Field targeted her. For most of her Lasso employment, he made romantic and sexual overtures toward her. Although Young participated in the conduct, Field used his position as the most senior executive to cultivate the relationship. Also, Field knew that Young was vulnerable given that she was in an unsafe relationship with her then-boyfriend and later fiancé for most of her employment at the Company.

137.    Later in Young's employment, after she rejected Field's efforts to escalate the relationship further, after she refused to sign a release of claims, and after there were questions raised about his relationship with her, Field took a new approach. He was hostile towards Young and undermined her standing at the Company, including, for the most part, ignoring her emails, Slack messages, and text messages; cutting off her communications and other interactions with Lasso team members; and moving her to a diminished role.

138.    Shortly after Young joined Lasso, Field made romantic and sexual overtures toward her. Many Lasso employees observed that Field was obsessed with her. They made comments about how Young was his favorite, that he and Young should get a room, that he and Young should

"just date," that his relationship with Young "seemed like a cutesy crush that escalated quickly," and that it was "undeniable that [Young] was special to him."

139.    Some examples of Field's conduct are described below:

•    Field often discussed his personal life with Young. On many occasions, Field discussed details of his personal life, including his previous marriage, divorce, therapy, and dating life.

•    Field repeatedly asked Young about her personal life. For example, he asked her about her dating experiences and sexual history.

•    Field repeatedly tried to convince Young not to marry her then-fiancé and told her she needed to "date and marry up." On multiple occasions, he told Young that she should end her relationship with her then-fiancé—whom she had been dating for six years, since she was 20— and not marry him. Field told Young, in sum and substance, that she knew that she did not want to marry her then-fiancé and that she needed him to confirm it. Field helped Young draft her prenuptial agreement with her then-fiancé and told her not to trust him. Young's now ex-fiancé believed that Field was responsible for ending their relationship.

•    Although most of the communications described herein took place in person, Field did send Young numerous messages of a personal nature using both text and Slack messaging. For example, on Thanksgiving in 2021, Field sent Young a Slack message telling her that he was grateful for her and showing her a picture of what he was doing. Field also regularly sent Young personal photographs, including vacation pictures. To Young's knowledge, she was the only woman at the Company to whom Field sent these types of intimate messages and, except for certain others with whom he had longstanding and preexisting relationships outside the Company, she was the only person at the Company to whom Field would send these types of intimate messages.

•  Field made statements about his feelings towards Young and referred to their special relationship. For example, Field repeatedly told Young that he loved her (in a sincere and non-joking manner). Young never told him that she loved him back. Field also said to her, in sum and substance, "I could talk to you forever" and "I never want our conversations to end." In addition, in response to an email Young wrote to Field about bias toward men, Field responded, in sum and substance, that her email to him read "very personally" and that would not be acceptable to future bosses but that he and Young had a "special relationship so it was fine."

•  Field spent more time working and meeting with Young than almost any other employee—including employees of a similar rank to Young—from the day she joined the Company. In or around November 2021, Field said to Young that he did not "spend as much time with anyone in this entire company as [he did] with [her], except maybe [the co-founder]." He consistently cancelled or failed to show up to one-on-one meetings he had scheduled with others. In contrast, with Young, he increased the frequency of their meetings to multiple times a week.

•  Field frequently scheduled meetings together late in the evenings. On information and belief, he did so in order to ensure that they would meet alone in the office.

•  Field made efforts to meet with Young alone outside of the office. For example, when Field visited the New York office, he asked Young to have dinner with him alone at an expensive restaurant. He claimed that he wanted to meet to discuss her career, but, instead, they discussed their personal lives. The first thing he asked Young when they got seated at dinner was whether she had gotten married because he needed "closure," and, when she said she had not, he expressed relief. The dinner lasted four hours.

•  Field frequently invited Young to travel to Austin even though it was not necessary for business reasons. Even when Young did travel for business reasons with other New York-based

employees, Field asked her to stay longer. For example, Young's coworkers sometimes left on a Thursday, and Field often asked Young to stay until Friday. On a few occasions, Field asked Young to stay until Saturday. In those instances, he and Young spent time alone together.

• Field paid significant attention to Young's well-being outside of work. In or around January 2022, Young took off two weeks to have surgery. Field sent her text messages or called her every single day to check in on her recovery. Field did not do this with other employees.

• Field made over-the-top efforts to care for Young following her suicide attempt in April 2022. Field called Young up to five times a day. During those calls, he told Young that he was not going to "let [her] be alone," that taking care of her was his "priority," and that "there [was] nothing more important to [him] than [doing so.]" Even though at the time Field had a girlfriend and Young had a fiancé, he insisted on traveling from Austin to New York to check her out of the hospital. His offer made Young uncomfortable, and she rejected it.

• Field asked Young to move closer to him. During the time Young was formulating her hospital discharge plan in late April 2022 following her suicide attempt, Field suggested that she move to Austin, Texas, where the Company was headquartered and where he lived, to be closer to him. Young initially agreed but later decided to remain in New York. At the time Field was pressuring Young to move to Austin, she was in the psychiatric hospital recovering from her suicide attempt and under a significant amount of emotional distress.

• Field made clear that he wanted to date Young and also monitored her housing situation. After Young rejected his invitation to move to Austin, he insisted that they meet in person the day after the hospital discharged her in late April 2022. When they met, Field said, among other things, that Young needed to "date up and marry up" and that her then-fiancé was not it because he would "always be a senior software engineer." Field said that Young needed to "be

with a CEO." Field also told Young that both he and she are "awesome"; that they needed to find "better people to date" (Field was in a committed relationship at the time); and that they should see who could do it first. After Young ended her relationship with her fiancé, she told Field that she was seriously considering buying an apartment in New York City. Field was adamant that she should not do so because he said that she needed to maintain maximum flexibility in case she decided to move to Austin later.

•       Field pressured Young to make decisions related to her employment contrary to what was in her best interest. As described above, after Young's suicide attempt, Field, taking advantage of the intimate relationship he had cultivated with her, convinced her to extend her medical leave even though her doctors cleared her to return to work. Also, Field pushed Young to work closely with him, including in a capacity as Chief of Staff (although she never formally assumed the role), even though that role was not a helpful step for advancing her career at such a small company.

•       Field frequently made physical contact with Young. For example, Field frequently held Young's hand and hugged her. Also, Field often got within inches of Young physically as if to kiss her. He then would move away from her to another part of the room, never actually consummating the act.

•       Also, on or about July 28, 2022, Field met with Young in person. He knew at the time that she had ended her engagement. He asked Young for forgiveness. He grasped both of her hands and said that he did not believe she did anything wrong, including in her communications with him, despite placing her on administrative leave for supposedly breaking Company policy. He told Young that the Company would reinstate her to her job. He said, in sum and substance, that he understood if he had broken the "trust" between them and if she no longer wanted anything

to do with him, but that he wanted to try. He told Young that he was committed to her, that he would protect her, that he would do better by her, and that he should be her first call if she needed anything. He also told Young that he was finally going to break up with his girlfriend and explained to Young specifically how he planned to do it.

140.    Field's harassment tactics, however, changed when Young rejected his efforts to escalate the relationship, when questions were raised about his relationship with her, and when she refused to sign a release of claims, including her discrimination claims. Instead of making sexual and romantic overtures, his new approach was to subject her to gender-based hostility.

141.    For example, as set forth above, Field asked Young to move to Austin to be closer to him. Ultimately, Young declined his invitation. Shortly thereafter, the Company, with Field's approval, placed Young on administrative leave. He also ignored her text messages and other communications throughout most of June 2022.

142.    In addition, as set forth above, on or about July 28, 2022, Field told Young that he was finally going to break up with his girlfriend. In response, Young said that even though she had ended her engagement to her fiancé, she was then dating someone else. Field knew that Young was dating someone else and specifically a CEO. Field was plainly angry at Young for dating someone else. He said, in sum and substance, "good luck" and that, if Young's new boyfriend treated her well, it did not mean anything. It became clear then to Young that Field was referring to himself when he previously told her that she needed to "be with a CEO."

143.    Around this same time, in July 2022, IQVIA completed its acquisition of Lasso. Upon information and belief, as part of the due diligence process in the months leading up to the deal, questions were raised about Field's relationship with Young and, as a result, Field sought to

distance himself from Young so that the deal would go through and to avoid further scrutiny. To Young's knowledge, Field did not treat male employees in this manner.

144.    Also, around this time, the Company asked Young to sign a general release in connection with the IQVIA transaction. Young objected to doing so. Upon information and belief, Field was angry at Young for not signing because he was worried that she was preserving her legal claims, and specifically, her discrimination, sexual harassment, and retaliation claims against the Company.

145.    Between August and December 2022, Field was hostile toward Young, including undermining her work. He ignored Young, did not meet with her in person or virtually, and did not respond to her emails, text messages, Slack messages, or other communications. The Company and Field cut Young off from the Lasso team at IQVIA and transferred Young to a new, lesser role. Field instructed the Lasso team not to communicate with Young and to report Young to Human Resources if they heard from her.

146.    Field's sexually harassing conduct, including his romantic and sexual overtures and gender-based hostility, have caused Young significant emotional distress, including another suicide attempt in 2023.

Young's Dismissal

147.    As set forth above, for months the Company, including the CEO, subjected Young to sexual harassment and emotional abuse; discriminatory pay; race, disability, and gender discrimination; and retaliation.

148.    Young repeatedly sought to remedy the problems, including by requesting reinstatement and making protected complaints.

149.    Not only did the Company fail to fix the problems, but it retaliated against Young, by, among other things, assigning her to a diminished role. As a result, Young began exploring other opportunities outside the Company.

150.    During the late fall 2022, Young spoke to Lin, Vice President and General Manager of Digital Media at IQVIA. Young told Lin about job offers that she was receiving outside IQVIA, including some of the terms of those offers, in an effort to negotiate a better role. Lin told Young that the Company could not match those offers nor approve a promotion or large pay increase outside of the normal company cycles. Young later discovered that this was false. One of her peers at Lasso, a white man, successfully negotiated a better compensation package with the Company outside of the normal cycle.

151.    Lin further told Young that he considered the discussion to mean that she was leaving the Company even though she did not resign.

152.    The Company later told Young that her last day could be early December, or she could work through the notice period until approximately December 20, 2022. Young chose to work through the notice period. At the Company's request, Young submitted a resignation letter.

153.    Young's last day at IQVIA was December 20, 2022.

FIRST CAUSE OF ACTION
Discrimination in Violation of Title VII

154.    Plaintiff repeats and realleges paragraphs 1 through 153 of this Complaint as if set forth fully herein.

155.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender and race, in violation of Title VII.

156.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

157.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

SECOND CAUSE OF ACTION
Discrimination in Violation of the ADA

158.    Plaintiff repeats and realleges paragraphs 1 through 157 of this Complaint as if set forth fully herein.

159.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the ADA.

160.    Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights under the ADA.

161.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

THIRD CAUSE OF ACTION
Section 1981: Race Discrimination

162.    Plaintiff repeats and realleges paragraphs 1 through 161 of this Complaint as if set forth fully herein.

163.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her race, in violation of Section 1981.

164.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Section 1981.

165.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, damage to professional reputation, and other compensable damage unless and until this Court grants relief.

<u>FOURTH CAUSE OF ACTION</u>
Discrimination in Violation of the NYSHRL

166.    Plaintiff repeats and realleges paragraphs 1 through 165 as if set forth fully herein.

167.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, race, and disability, in violation of the NYSHRL.

168.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

169.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>FIFTH CAUSE OF ACTION</u>
Discrimination in Violation of the NYCHRL

170.    Plaintiff repeats and realleges paragraphs 1 through 169 as if set forth fully herein.

171.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, race, and disability, in violation of the NYCHRL.

172.    Defendants engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard for Plaintiff's rights or conduct so reckless that it amounts to such disregard.

173.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION
Retaliation in Violation of Title VII

174.    Plaintiff repeats and realleges paragraphs 1 through 173 as if set forth fully herein.

175.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of Title VII.

176.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

177.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION
Retaliation in Violation of the ADA

178.    Plaintiff repeats and realleges paragraphs 1 through 177 as if set forth fully herein.

179.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of the ADA.

180.    Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights under the ADA.

181.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION
Retaliation Under Section 1981

182.    Plaintiff repeats and realleges paragraphs 1 through 181 of this Complaint as if fully set forth herein.

183.    By the acts and practices described above, Defendants subjected Plaintiff to unlawful retaliation in violation of Section 1981.

184.    Defendants acted with malice to and/or reckless disregard for Plaintiff's rights protected under federal law.

185.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendants' retaliatory practices.

## NINTH CAUSE OF ACTION
Retaliation in Violation of the NYSHRL

186.    Plaintiff repeats and realleges paragraphs 1 through 185 as if set forth fully herein.

187.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of the NYSHRL.

188.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the NYSHRL.

189.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

TENTH CAUSE OF ACTION
Retaliation in Violation of the NYCHRL

190.    Plaintiff repeats and realleges paragraphs 1 through 189 as if set forth fully herein.

191.    By the acts and practices described above, Defendants retaliated against Plaintiff for her opposition to unlawful discrimination in violation of the NYCHRL.

192.    Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or conscious disregard for Plaintiff's rights or conduct so reckless that it amounts to such disregard.

193.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

(a)    declaring the acts and practices complained of herein to be violations of Title VII, the ADA, Section 1981, the NYSHRL, and the NYCHRL;

(b)    directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated;

(c)    awarding Plaintiff all earnings and other benefits she would have received but for Defendants' unlawful conduct, including but not limited to wages, including back pay and front pay, bonuses, pension, and other lost benefits;

(d)    awarding Plaintiff compensatory damages, including damages for emotional distress, humiliation, injury to professional standing and reputation, and pain and suffering;

(e)    awarding Plaintiff additional amounts as punitive damages;

(f)     awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(g)     awarding Plaintiff reasonable attorneys' fees and costs of this action; and

(h)     awarding such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: New York, New York
        December 2, 2024

VLADECK, RASKIN & CLARK, P.C.


By:     _____*/s/ Jeremiah Iadevaia*_____
        Jeremiah Iadevaia
        Demitrios E. Kalomiris
        Attorneys for Plaintiff
        111 Broadway, Suite 1505
        New York, New York 10006
        (212) 403-7300